Briefly, in this case, Ms. Rebecca Smith appeals from the District Court's summary judgment in her Bivens action. She was camped on a tree platform in the Bitterroot, or in a forest area, and she was protesting one of the Forest Service plans related to salvage logging in an area that had burned over in Montana. She has sued the Forest Service here, claiming that her civil rights were violated because the Forest Service arrested her and also limited her access to food and water while she was camped out on the tree platform. You may proceed. Thank you, Your Honors. My name is Tom Woodbury. I'm here today representing Rebecca Smith. I think it's important also to understand the context of this protest. This is the Bitterroot National Forest, and it was a protest over what was clearly an unlawful decision and had been found so by the District Court of Montana. And the reason the court said that the decision of approving this timber sale was unlawful was because it cut out the public and the Forest Service essentially took the law into its own hands. And that unlawfulness was never actually remedied. And the project went forward, and Ms. Smith was part of a group, Wild Rockies Earth First, that was involved in monitoring the implementation of the sale and was also documenting further violations of the law, which were subsequently confirmed by U.S. Fish and Wildlife Service as violations of the Endangered Species Act that resulted in extirpation of bull trout. So this was clearly a controversial timber sale, and for the first two weeks of the protest, while Ms. Smith and Mr. Wyatt were in the trees, the Forest Service was very clear that they were not violating any laws, they were not obstructing timber sale. The timber project, the harvest project, was ongoing at all times relevant to this protest. Instead, what they were doing was succeeding in bringing a lot of public attention to the timber sale and basically embarrassing the Forest Service in the press. And I think that's important from a First Amendment standpoint. But nonetheless, they were technically in violation on day 15 of the 14-day tree camping limitation in the forest. And so there was probable cause to effect an arrest, and Ms. Smith does not challenge that that was the reason that she was placed under arrest by Mr. Ball. And she subsequently was convicted of that and some other crimes, however, as the lower court recognized and as the record here makes clear, at the time of the officers arresting and detaining Ms. Smith, it was clear to all parties that the purpose of that was to enforce the 14-day camping limitation. So in the Fourth Amendment context, they were allowed to use only such force as was objectively reasonable under the circumstances. And the essence of this objective reasonableness analysis is that the force which was applied against Ms. Smith had to be balanced against the need for that force. And we believe that that is the key point in this case, because as this court recognized in Deorley v. Rutherford and Headwaters, in the case of a nonviolent protester such as Ms. Smith, the first question for a jury to determine was whether there was any need for any force at all. And we believe that in this case there was no need for any force at all because of the minor regulatory nature of this infraction and the fact that she was not, according to the Forest Service, actually obstructing any... And what specific force on the facts of this case do you contend was excessive? What, what, I'm sorry? Well, you're arguing there's excessive force. Okay. What about the force was excessive? Let's get down to brass tacks and talk about the depriving her of sleep over a prolonged period of time during, in conditions that were dangerous. I mean, basically we have provided medical testimony that makes it clear, and I don't think that it is a matter of dispute, that prolonged dehydration is a potentially, is a lethal force. That she, her life was in danger after a period of days of prolonged dehydration. After the first week of the enforced starvation and dehydration. It's enforced only in an odd way. That is to say, she's free to come down anytime she wants to and come down and get a drink of water. She's free on the condition that she end the protest. Basically, basically they, you know, the same thing was true in Headwaters. They were, they were free to release themselves from the Blackwater and sit in at any time, but that doesn't justify torture. But that was a different type of force in Headwaters. The facts were quite different in Headwaters. The force used was quite different, right? The facts were different in Headwaters because it was actually not even lethal force. Here, the force, the enforcement at issue here could have actually resulted in her death. That was not true in Headwaters. So even though in Headwaters, it was a more intense, you know... So let's look at a practical alternative. One alternative is they could say, well, you can just stay up there and get food forever, but that's of course in violation of the law, which she doesn't challenge. She was in violation of. Another alternative would have been to go up there and bring her down, correct? Yes, which they ultimately did. Which they ultimately did, but they gave her about two weeks to decide to come down on her own first. So in your view, would it have been reasonable if they went up there and if she resisted arrest, to arrest her just right off the bat? Well, they did arrest her. They arrested her, but she wasn't taken into custody. When you say the force was to deprive her of water, right? One of the things. You're talking about stabbing that plastic water can? They also cut down about eight jugs of water. And they wouldn't let anybody give her water. So would your facts, your assertion be the same, say if she was up there in the tree, didn't have any water, and say there was a faucet 10 feet away from the bottom of the tree and she could come down and get a drink of water. What's the difference? And she didn't do it. Would you still claim, would you still contend it was, you know, excessive force? Basically, the Forest Service was saying, if you will end your protest, we will attend to your basic medical needs. So answer my question. Suppose, you know, she didn't have any water and there was a faucet 10 feet away at the bottom of the tree. Would there still be excessive force? Well, there was water at the bottom of the tree. Yeah. That's what I'm getting at. It's sort of the same question Judge McEwen asked. I mean, she could, you know, clamber down the tree and go get a drink of water. And she would have been, and her protest would have been at an end at that point. So the argument really comes down to, well, the authorities have to help me continue my protest, right? Well, they put her in the position that she, of her life being in danger. So if they had never taken the water. That's what I mean. I mean, so under my hypothetical, if they didn't do that, she just ran out of water. Right. Right. Your case wouldn't be any different, would it? Well, she never would have run out of water because she had a ground support crew that was at all times prepared to. Well, if they kept. All right. So say if they kept the ground support people away. Right. You know, they say, you know, put a yellow tape 100 yards around there. It'd still be excessive force. Yes. Under your theory. Yes. Yes, it would. Because again, the Forest Service or the law enforcement office officers are the one the ones that through the show of force are depriving her of the basic necessities of life. So really, the alternative you're saying is she was arrested. She was arrested legally. They should have, in your view, gone in and taken her off the platform forcibly because she wouldn't come down. We believe that that would not have placed her life in jeopardy. And so therefore, that's an to consider under headwaters decision, the reasonableness of of the enforcement of the law. In this case, the reasonableness of the officer's actions has to be gauged in terms of what alternative means of enforcement of the 14 day camping permit were available and that they are obligated to consider those alternatives at all times. So yes, we believe that if they had actually just gone in with a cherry picker on day 15 and done the same thing they did two weeks later, that they would arguably that that would have been a reasonable jury would could clearly find that would be a right. Is there any more excessive force besides the I'll just shorten and just call it deprivation of water. Is there any other excessive force involved in your view of the case? The plaintiff does have a claim that that it was excessive to extract her with a cherry picker. But you're talking about gradations of, you know, at this point, which kind of undermines your title to a jury. So that undermines your claim that that that would have been their best alternative to begin with is to go in and get her with a cherry picker because she would still have an excessive, you know, the best alternative would have been to simply find her every day that she was up the tree over the period. Okay, that's what they that was the established practice. They've never arrested anybody before or tortured anybody for overstaying a camping permit. And so they crossed the line. I know they've arrested people before because we've had cases. Unless you consider issuing a citation to be an arrest. Technically, that may be that may be true, they've never actually placed somebody under arrest and custody for overstaying a camping permit. So there's a whole spectrum of alternatives here, but there's nothing in the there's no evidence in the record that they ever considered anything other than this original strategy of removing food and water supplies if they don't come down and submit to themselves to arrest. And then just basically engaging in what amounted to a death watch to see if she was going to fall out of the tree. And the other important thing here is that that this is a continuing obligation because of the situation they put her in. After the first week that she was up in the tree is she complained of dehydration to the officers, including Officer Brandon Berry. And she was basically prone for the back. And it was it should have been clear to any reasonable officer at that point that maybe prior to this, this seemed like a good idea because, you know, a type of coercion that they're going to realize eventually they're going to run out of food and water, they need to come down. But at that point, it became basically a life and death situation. And at least a reasonable officer would have inquired into what are the risks of dehydration? How much water does somebody in this situation actually need compared to what we believe that she is actually and has available to her? And day after day after day, they would just come and say, you know, while she was prone and basically uncommunicative at that point, if you come down, we'll give you some water. We'll give you some emergency medical treatment if you come down from the tree. Well, you know, that's that's in effect torture. And this is so at some point this jury could determine that they crossed a line. Let me ask you about that. If we were to determine that, you know, you start out on day one and say she doesn't have a lot of water and then it just kind of peters out and then we get into a crisis situation like you described. If we were determined that at some point there was a constitutional violation, the question then is whether it was established. Right. You know, is there any case that really establishes when you meet the make or break point? Yes. Such that the officer would actually not receive qualified immunity? Yes. And two ways that that's clearly established. The Holt versus Pelzer line of authority of, you know, you've basically got her in a custody situation analogous to pretrial detention or imprisonment. You have to attend to her medical needs. Number two, this is a lethal force and this is a misdemeanor crime. And there's no question that officers are not allowed to use lethal force or even, you know, force that could result in serious bodily injury, such as in the Dior case, for the crime of a non-violent misdemeanor, somebody who's not posing any threat to themselves. Did you want to save your remaining time? I would like to save the rest of my time. All right. May it please the court. Chuck McNeil with Garlington Lawn and Robinson in Missoula, Montana, appearing on behalf of the appellee, Missoula County Deputy Sheriff Ball. Mr. Tim Cavan will also argue on behalf of the United States Forest Service Law Enforcement Officer Dale Brandovery. And with that in mind, the argument will be divided and my argument will focus primarily on the few hours on the very first day that Deputy Ball was present. It's Ball's position, Your Honors, that the lower courts properly granted his motion for summary judgment, that there was no violation of the Constitution and that the law was not clearly established and that Ball is entitled to qualified immunity. In this court's de novo review, it is undisputed that Deputy Ball responded pursuant to a request for assistance under a cooperative law enforcement agreement. He arrived on July 23, 2002, and at that point in time, it's undisputed that Smith had been advised that she was in violation of the law. We have heard today, and it is true, that there was probable cause to arrest her. And then the focus became, in terms of Ball, on when he had authority to attempt to effect an arrest, was his conduct unreasonable during those few hours on that one day. He was only involved on that one day, is that right? Correct, Your Honor. He had no part in the, I'll just characterize it as the continuing decision days and weeks later to deprive her of water. Correct, Your Honor. When Ball left after a few hours, it's undisputed she had food, she had water, she had protection from the elements, she had sustained no personal injuries at all, and there had been no physical force used upon her by Deputy Ball. That's absolutely correct. It's also a misstatement to say that Deputy Ball actually arrested her. He attempted to arrest her, advised her that she would be placed under arrest, but she was not actually arrested until several weeks later when she was brought down from the tree by the federal law enforcement. The uncontroverted expert opinions before the lower court established that the law enforcement decision to remove water and food was reasonable. There is no evidence in the record to show that that decision by law enforcement was unreasonable. In fact, in Smith's opening brief at page 25, she admits that it was a reasonable inducement to reduce the protesters to custody at the start. So he cut down some of the water, some of the food stayed. Correct. And then he exited the scene. Right. After he was unable to bring them safely down by the use of the belay ropes. We believe that Ball has met his initial burden to establish that he's entitled to summary judgment on the qualified immunity argument. First of all, the conduct of Ball did not violate a constitutional right under the Fourth Amendment. There was no excessive use of force under the Graham decision. Ball necessarily had the right to use some degree of physical physical coercion or alleged threat in order to lawfully arrest her. And in this case, as to Ball, the alleged use of force was limited to removal of some of her provisions and water, nothing more. Your Honor's reasonableness of force is measured from the perspective of a reasonable officer on the scene, not with 20, 20 hindsight. In this case, the force, minimal force, if any, that was required is to be measured against the need for the force. We have uncontroverted expert opinions that the force used, if any, if you want to call it force, was reasonable and appropriate law conduct. The Headwaters cases and the other authority relied on by the plaintiff, Smith, is the opposite. In Headwaters, as this court recognized, there was repeated spraying of pepper spray into the eyes of the protesters, peeling back of eyelids and putting the pepper spray underneath their eyelids and then depriving them of water to wash it out. This happened over the course of several events in different time frames. Plaintiffs also rely on the Diorle case where a lead-filled beanbag was fired into the face of a emotionally disturbed person causing severe physical injuries. Again, that involved a use of force that was found to be excessive. More recently, this court addressed excessive use of force in the Davis case where an officer repeatedly slammed an arrestee's head into a wall. Those are all extreme circumstances that are markedly different than the conduct of Ball on this day acting under the direction of the federal law enforcement officials in connection with the Cooperative Law Enforcement Agreement. Here we have a situation where clearly there was an intentional violation of law. There was legal authority to attempt to effect an arrest with probable cause. There was affirmatively resisting the lawful arrest by hooking herself to the tree with the black bear device and there was no physical force used on her by Ball at any time. She chose to lock herself to the tree. She chose not to come down when directed to do so. Then Ball left. That's the end of the clear that his conduct was objectively reasonable. The balancing of the various intrusion of the constitutional rights of the individual versus the countervailing governmental interest will be more fully addressed by Mr. Cavan, but the Supreme Court has found that there is a hazy border between excessive and acceptable use of force in the context of shooting a fleeing suspect in the back. There is also the Kennedy decision from this court where the standard is not whether the very action in question has previously been held unlawful, but whether existing case law provided fair warning to the officers that the conduct was unlawful. Here there is no clear legal authority in existence to indicate to Deputy Ball as a reasonable officer under the circumstances that his conduct was an excessive use of force. The cases relied upon by Smith are Eighth Amendment cases which do not apply in a Fourth Amendment context. They're entirely distinguishable. In this qualified immunity analysis under Saussure, if there was a violation of constitutional rights which we dispute and which the lower court found there was none, then the focus turns to whether that conduct was in violation of any clearly established constitutional rights of which a reasonable officer would have known, and absent any authority that level cannot be met by the Smith case. In this case, any effort by Smith to retry the merits of her criminal convictions, she was tried and convicted and the convictions were appealed to this court and affirmed, or an effort to is a clear situation for qualified immunity and we respectfully request this court to grant or to affirm the grant of summary judgment in favor of Defendant Ball. Thank you, Mr. Cavan. We'll now address the balance. Thank you. Good morning, I'm Tim Cavan. I'm Assistant United States Attorney from Billings and I represent the Defendant Dale Brandenberry in this case. I would urge the court to carefully consider and weigh exactly what the plaintiff is asking the court to do in this situation. If this court were to adopt the plaintiff's position and find a constitutional violation based upon the facts of this case, then the lesson to law enforcement would be that while the Supreme Court may have said that you have the right to make an arrest and have the authority to make an arrest for a misdemeanor violation, you have no right to use any force to make that arrest. But your only course of action... I don't think that would be the take-home lesson from Mr. Woodbury's argument. It would be you have a right to make an arrest, you have a right to use force that's reasonable. The question is what's reasonable? And it might have some application in another tree-sitting case, but this is a pretty unusual setup. It is an unusual setup, Your Honor, but it maybe should have been directed to situations such as this. Because what you're saying, if the force used in this case was excessive, which is essentially to use no force at all and to essentially leave the matter in the protester's hands to decide when she's going to terminate her unlawful conduct, if that force is excessive, then you're really left with no viable alternatives. Well, the viable alternative would be just simply get the cherry picker and after a few days go in and arrest her physically, decouple her from the tree, and bring her down. Well, and with respect, Your Honor, that's a little bit more complicated than it sounds. I understand, but you didn't need to wait 14 days or two weeks to do that. And so I think the argument that you have to focus on is that maybe day one is okay, day two, day three, day four, but when they get in a situation where they should reasonably recognize that she's suffering from severe dehydration or potentially in a life-threatening situation, then it isn't reasonable to do nothing. So that really seems to me to be the nub of the argument made. Well, if that's the argument, Your Honor, there is no facts in this case which would support that they ever reached that point. The facts in this case, the ones that were before the district court, are that they were monitoring or at least questioning Ms. Smith's ground support crew about what her condition was. Keep in mind, she wouldn't communicate with them at all and wouldn't communicate with Officer Brandeberry or anybody else, and she affirmed that in her deposition. Their only communication with her was through her ground support crew. When asked by her ground, when asking her ground support crew how she was doing, they repeatedly assured her she's drinking a quart of water a day, she's doing fine. They assumed that her health was fine. Obviously, the situation can't go on forever, both from a law enforcement personnel perspective and for a lot of other reasons, including the fact that there were ongoing activities around this location. So at some point, more aggressive action had to be taken, and that's what they did. But even then, they went to use the least intrusive type of force they could possibly use and went to considerable lengths and an extraordinary risk to their own safety to bring her down. Finding a cherry picker that'll get up 50, 60 feet in the air in the Bitterroot Forest is one thing. Finding people that have the expertise to climb up and understand what they had to do to extract her. It's not a matter, you can't go up in a tree in a platform 50 feet in the air and just cut the thing off and take her off. They had to climb up to the very top of this tree and cut the tree off in sections. So that they could? All the way down to the platform or 50 feet so they could finally lift the blackberry over the top of the stump. So it's not as if that was a readily available, easy alternative to them at the beginning of this tree set. That ties into a point that Mr. Woodbury made, that they had to consider reasonable alternatives at all. And I would urge the court that they didn't. The question is, as this court held in Forrester, not whether they could have used less painful, less injurious, or more effective force. The question is whether or not the force that was used was reasonable. And if the court work concludes that the force that was used, and I would submit no force, if that was reasonable, that should end the inquiry. There are always going to be less intrusive, less painful methods of resolving a situation or of affecting an arrest. In this case, their alternative is to do nothing. To wait until she decides to voluntarily terminate her conduct and then to turn herself in. And at that point, she would subject herself to the authorities. But that is just setting the bar too high. If you're going to require law enforcement officers not only to use reasonable force, reasonable means in effecting an arrest, but also to sift through and find the least intrusive alternative. Just as the Supreme Court has said, we're not going to look at the underlying reasons why officers make arrests. If it's reasonable, the same should apply here. If the force and the methods used were reasonable, that should end the inquiry. I would also like to point out that not only the safety risks that were involved here, but this was a serious situation. And we've heard a lot, and Mr. Woodbury in his briefs has emphasized that the only thing we have going on here is this 14-day cancel, and that's just not the case. She was committing and was convicted, and her convictions were affirmed of four separate criminal offenses, including the use and maintenance of an injurious device on public lands, including resisting arrest. What's that device? It was a helicopter blockade, Your Honor. And what they do is they go up and they string lines across a helicopter landing area. This was a helicopter landing area for logging. It was also a helicopter landing area for medevac purposes. And they string lines across trees, knowing that it creates a hazardous situation because if a helicopter comes down to that level, and if any of the rotors would touch those lines, or if those lines got sucked into the rotors, the helicopter fails. It crashes. And so it's a helicopter blockade. She was convicted of that offense. She appealed that offense to this court, and her conviction was affirmed. So these are significant offenses. And another important thing to keep in mind also, as this Court's recognized on different occasions, that this was not just an isolated incident. This was part of an organized, concerted effort to obstruct this lawful activity, to obstruct and hinder law enforcement. And the Court has recognized that this type of activity is far from ordinary, and in the Court's language, it menaces in a unique way the capacity of the state to preserve order and protect the rights of its citizens. So we don't want to minimize this conduct and say this was just a 14-day camping violation. It was much more than that. Well, what's your direct response to Mr. Woodbury's argument that the blockade and even if it is forced, it was reasonable? Is that what your position is? Absolutely, Your Honor. If it does constitute force, it was certainly a reasonable means of trying to accomplish that objective of ending the situation. Well, would you agree that if it reaches a point where it endangers the health of Smith, then it's no longer reasonable? Well, I think if it reaches a point where her health is endangered and the officers know that her health is endangered and have that knowledge and are aware of that... What about if they know or should have known? Well, I guess... In other words, if someone goes without adequate water for 10 days, most people have some suspicion that something might be wrong, right? Well, in how much water she had, we don't know. The evidence is, the facts are, that she advised the ground support crew or in turn advised the officers that she was drinking water every day, a quart of water every day, that she was fine. Obviously... That's not contested? That's not contested. So if they had knowledge that her health was seriously jeopardized, then they should and did take more aggressive measures to bring the matter to a more precipitous end. And that's exactly what they did. Just finally, I'd just like to briefly touch on the clearly established prong of the qualified immunity analysis and point out that even if the court were to conclude, which we would urge the court not to conclude, obviously, that this was a constitutional violation, it certainly was not a clearly established constitutional violation. There are simply no cases in existence that would establish that the means and methods used by law enforcement in this case violated her Fourth Amendment right or any other constitutional right. And I know that in cases where there are obvious constitutional violations, you may not need that body of case law to clearly establish the constitutional right. But in this case, this is anything but an obvious case. There's been two federal courts that have looked at this. Neither one of those judges found a constitutional violation, much less an obvious violation, and it would certainly be much less obvious to the officers in the field. In that by the plaintiff in this case is the Headwaters case. And I can tell from the court's reaction that they thought that the facts and circumstances of that case were dramatically different than in this case, and I would certainly argue that point. But what I'd like to add to that is, if that's the guidance that's to be used here, you could have taken those Headwaters decisions out to the field when this was going on, and you could have handed out those decisions to law enforcement folks that were on in the field and said, read these cases. And they could have reasonably believed that they were doing exactly what was counseled in the Headwaters cases. Don't use pepper spray. Don't use pain compliance. If you can drag them from the scene or extract them from the scene, try to do that, which they did. If you can cut them off, try and cut them off, which they couldn't do, and failing all that, wait them out. They did exactly what was counseled in the Headwaters decisions, and there's absolutely no way that the means and methods that they used in this case were a clearly established violation of the Constitution. Thank you. Thank you. Mr. Wood, will you have some time for rebuttal? You don't feel compelled to use it all, but it's up to you. Some important points. This is summary judgment, so all reasonable inferences need to be decided in favor of Ms. Smith. The issue about the availability of a cherry picker, there's no evidence in the record that it wasn't available. They started this tree sit on July 8th. The cherry picker was brought out August 6th. The reasonable inference is that they could have found a cherry picker between July 8th and July... What's the state of the evidence with respect to what the authorities were told about how much water she had and how much water she was drinking during this period? Well, the court found that Officer Brandenberry had no idea that she was dehydrated. That gets to the reasonable inference, again, at ER 94, Officer Strickland's affidavit says that on July 31st, the day that she complained, which is when her health really... She'd been up a week. She occupied the platform. I asked if she was okay. Smith stated she was dehydrated. My supervisor, Dale Brandenberry, spoke with her. Clearly, the reasonable inference is that Brandenberry was there and either directly heard her say she was dehydrated or was informed of that indirectly by Officer Strickland. The evidence in the record from Dr. Milan is that at a minimum, about three quarts a day of water is necessary to prevent dehydration. So at a minimum, a quart of water a day might keep you alive for a while, but over a prolonged period of time, your situation will become progressively worse. You'll be subject to seizures. She did suffer pain and potential death. Also, in that weakened condition, there's a very real risk that she could have simply fallen out of the tree. So the statement from Mr. Bowersox that she was getting a quart of water a day and was okay, her testimony, I believe, was that that came at an earlier time. There's certainly not evidence that he repeatedly told them she was okay. They could see she was not okay. How could they see she was not okay? She was up on a platform. She was prone and not moving and uncommunicative for a period of seven days. Did they see that she was prone? They were using binoculars. Yes. Was she in communication with her support team during that time? That's the other thing that she testified to at her deposition, which was before the court, was that her medical support was also informing Brandenberry that she was in trouble and that Brandenberry was there on a daily basis. So he had an opportunity to see. But again, a quart a day, he is responsible for her medical condition. And why would they be offering her water and emergency medical technician at the bottom of the tree if they thought that she was fine? Why would that be a reasonable inducement? What's the state of the evidence with respect to any injury that she eventually suffered? Was there any permanent ill effect? Yes. From Dr. Milan's testimony or affidavit, you can see once you suffer moderate to severe dehydration, then you will be basically you're prone to easily getting dehydrated again and having the same symptoms of urinary tract problems basically the rest of your life. So, yes, she still has those problems. I thought his affidavit was they hadn't seen her. I'm sorry. I thought he didn't actually see her. Yes, they they they could clearly see her. No, no, no. I mean, the doctor, the doctor. Oh, no, the doctor has not. The doctor did that on the basis of the medical. He said I haven't had a chance to interview her personally. And the information that she had. So he's just advancing medical theories, what he's doing. So he's just advancing generalized medical theory. No, she looked at her medical records from a release when she and the other the other point is that before that July 31st date, the other protester came down suffering from dehydration and was taken to the hospital. So, again, there's notice there that, you know, clearly they were both in the same situation. He was suffering from dehydration. Obviously, that there's a risk of her. When you say same situation, they both had the same water supply. Well, I think he had a little bit less, but but but basically they were neither. One of them was getting adequate supplies of water. And then as to Officer Ball's involvement, we would just say that that, you know, they knew what the purpose officer knew what the purpose of removing the water and food was. He's the one that put her in that situation and he knew what the purpose of that was. And so he had it was reasonably foreseeable then that that she was going to be suffering the consequences of his actions. And we would argue that created a continuing duty on him to to have some concern for her situation and that he should have. Since he is the one that put her in that situation, it was incumbent on him at some point to come forward and say, look, this is not right. Thank you. Appreciate the arguments from both counsel here. The case of Smith v. Ball is submitted. And this would conclude the session of the Ninth Circuit Court of Appeals. So we're adjourned. And I guess now we'll reconvene. So we'll take questions. First, let me thank all of the attorneys who appeared here this morning. I think for the students, you saw attorneys from Alaska, Montana, Idaho, Washington, those from the Justice Department, from Washington, D.C. And you really saw an amazingly good array of attorneys and some very, very good oral arguments. So I do thank the attorneys. I know it's not as easy sometimes with an audience behind you. I also want to thank our clerk of the court, Stacy Bremner, and our computer guru, because we have to kind of move all of the court electronics and innards out here. And so we also thank Dennis DeLong and also the U.S. Marshals Service, who provides the security. So we'll take questions first. I mean, we might make a few comments here and there, but I think you'd rather have questions. You can ask anything about the Ninth Circuit, oral argument, et cetera. But you may not ask about the specific cases this morning. May we stay? Sure. And the attorneys are welcome to ask questions, too, as long as you don't ask about your case. So this is your opportunity. So we'll open the floor. Anybody? Can I ask about that on-bank hearing in a couple of weeks? Well, you can. No, you can't. That's a specific case. Welcome. Welcome back to the Ninth Circuit. I mean, I will just say about the in-bank proceedings he's referring. We do have four times a year in-bank proceedings, and those are cases where particularly important or unresolved issues are reheard by the court in a panel of 11 judges. So if you thought it was hard to get a word in edgewise for the attorneys or the judges today, you can imagine 11 judges. And we have those. We do somewhere between 15 and 25 of those cases every year. Yes? I have an interesting situation because I'm the mom of a law student who is back at Cardozo in New York City. And he's trying to make a decision as to should he apply for a clerkship with the Ninth Circuit. And I have said after I'm finished with this, yes. Do you have any advice for the students here about clerkships? We do, I'm sure. Well, I think this is advice that all of us would give. We love our law clerks. And by and large, we think our law clerks like working for us. It's a very valuable experience, whether it's on the court or in the courtroom. It's a wonderful opportunity for somebody right out of law school to get, as it were, behind the scenes.
judges: Tashima, McKeown, Fletcher